# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SOUTHERN UTE INDIAN TRIBE,

    Plaintiff,

v.                                                                                  Civil No. 05-988 WJ/LAM

MICHAEL O. LEAVITT, Secretary of the
United States Department of Health and Human
Services, et al.,

    Defendants.

## MEMORANDUM OPINION AND ORDER ON
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court pursuant to Plaintiff's Motion for Preliminary Injunction (Doc. 3) and Defendants' Motion for Summary Judgment (Doc. 14).  After reviewing the briefs in both parties' motions, I issued an Order to Show Cause why the preliminary injunction should not be consolidated with the merits of the case (Doc. 37).  The parties agreed that consolidation was appropriate.  Additionally, at a hearing on February 8, 2007, the parties agreed that the legal issues are fully briefed and may be decided without further argument.  Accordingly, I decide here the purely legal issue whether the Defendants had discretion under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450 through 458bbb-2 ("ISDEA"),to decline to enter into a contract with the Plaintiff Tribe to assume control over and management of the programs, functions services and activities of the Southern Ute Health Center.

**INTRODUCTION**

   Plaintiff, Southern Ute Indian Tribe, is a federally recognized Indian tribe organized pursuant to Section 16 of the Indian Reorganization Act of 1934 (codified at 25 U.S.C. § 476). Congress enacted the ISDEA in recognition of "the Federal government's historical and special legal relationship with, and resulting responsibilities to, American Indian people . . .." 25 U.S.C. § 450.  Congress set forth a method within the ISDEA for Indian Tribes to assume control over certain federally provided programs.  Relevant to the instant case, the ISDEA directs the Secretary of the United States Department of Health and Human Services ("HHS"), upon request of an Indian tribe, to enter into a contract by which the Tribe assumes direct operation of an HHS federal Indian Health care program.  25 U.S.C. § 450f(a)(1).  Under the ISDEA, if an Indian tribe submits a proposal for a self-determination contract, "the Secretary shall, within 90 days after receipt of the proposal, approve the proposal and award the contract . . .." 25 U.S.C. § 450f(a)(2).  The secretary has very little discretion to decline to award a contract proposed by an Indian tribe.

   On or about January 25, 2005, Plaintiff submitted a proposal pursuant to 25 U.S.C. § 450f to contract for the administration of the Southern Ute Health Center ("Clinic"), a facility of the Indian Health Services ("IHS") that is the primary health care facility for the Plaintiff Tribe's members.  By letter dated February 28, 2005, a Contract Proposal Liaison Officer ("CPLO") with IHS notified Plaintiff that some portions of the proposal required further clarification.  Pl's. Ex. 2. The letter noted that IHS was continuing to review Plaintiff's proposal for contract support costs ("CSC"), but stated that Congress had not appropriated any new money for CSC and it was unlikely that any start-up costs would be paid.

On March 1, 2005, the United States Supreme Court decided <u>Cherokee Nation of Okla. v Leavitt</u>, 543 U.S. 631 (2005). In that case, the Government had not fully paid CSC to tribes that had existing ISDEA contracts that included an agreement to pay CSC. <u>Id.</u> at 635. While the Government acknowledged its contractual promise to pay the CSC and its failure to fully pay, it argued that it was not legally bound by its promise because Congress had not appropriated sufficient funds to fully pay CSC to all tribes with ISDEA contracts. <u>Id.</u> The Supreme Court found that Congress had appropriated sufficient unrestricted funds to pay CSC for the particular contracts at issue for the Fiscal Years at issue. <u>Id.</u> at 637. The Court held that the Government was bound by its promise to pay CSC. <u>Id.</u> at 647.

For Fiscal Year 2005, Congress appropriated $263,638,000 to IHS to pay contract support costs and stated that money expended for contract support costs was not to exceed this amount. Medrano Dec. (attached to Def's. Mem. in Support of Summary Judgment). This amount does not represent sufficient money to pay contract support costs for any new or expanded program assumption under the ISDEA. <u>Id.</u>

On March 24, 2005, Plaintiff responded to the CPLO's letter with the requested clarifications. Pl's. Ex. 3. Under the ISDEA, IHS had 90 days to approve the proposal or provide written notification of declination of the contract for one of five permissible reasons. However, the 90 day period may be extended with consent of the tribe. 25 U.S.C. § 450f(a)(2). Prior to the expiration of the 90 day period in this case, the IHS Acting Director of the Office of Tribal Support ("Acting Director") sent a letter to Plaintiff requesting a thirty day extension due to restructuring within IHS of the contract proposal review process. Pl's. Ex. 4. Plaintiff responded that it would like some indication that the tribe had adequately addressed the CPLO's

concerns and would also like some details regarding any effect of the restructuring on Plaintiff's particular contract proposal.  Pl's. Ex. 5.  The Acting Director responded back with some additional detail with regard to portions of Plaintiff's proposal that were not sufficiently clarified. Pl's. Ex. 6.  The letter also reiterated a request for Plaintiff's consent to the thirty day extension and stated that, in the absence of an extension, IHS would proceed to approve the contract to the extent the proposal was satisfactory, and provide Plaintiff with a timely partial declination letter to the extent the proposal was not sufficient as indicated.  Id.

Plaintiff responded to this latest letter with its interpretation of the statutory requirements for a declination, i.e., that refusing to grant an extension was not a valid reason for declination, that IHS had never provided Plaintiff with a clear explanation of potential declination issues, and that IHS was required to inform Plaintiff within the 90 days of any potential declination issues and provide technical support which it had not done. Pl's. Ex. 7.  Plaintiff expressed concern that IHS was not following these rules with respect to Plaintiff's proposal.  Id.  However, Plaintiff gave its consent to a thirty day extension.  Id.

The Acting Director responded by letter agreeing with Plaintiff that refusal to consent to an extension was not grounds for declination.  Pl's. Ex. 8.  He then proceeded to outline specific areas of potential declination with regard to Plaintiff's proposal and made recommendations for modifications.  Id.  He stated that,

> The Area[1] has made the decision to decline the tribe's request to contract for the CEO, the Health Center Director, the Clinical Director, the Chief Pharmacist, and the Administrative Officer positions based on 25 U.S.C. [§] 450f(a)(2)(A)-(E) Declination Criteria "The program, function, service or activity (or portion thereof) that is the subject of this proposal is beyond the scope of programs,

---

[1] Presumably, this refers to the Albuquerque Area Office of the Indian Health Service.

4

>   functions, services or activities under section 102(a)(1) of the ISDEAA because the proposal includes activities that cannot lawfully be carried out by the contractor". More specifically, a Tribal employee cannot by law manage and obligate the services and funding of Federal Programs and Federal employees. By contracting only the decision making and administrative aspects of any service program and not including the p,f,s,a's[2] that go along with each of these positions the tribe is asking the Area to approve an unlawful act. If the Tribe were to modify the proposal to include the p,f,s,a's under the direction of each of these positions the Area would have a proposal that could more easily be approved.

Id. The Acting Director further stated that areas of recommended changes with regard to other concerns could be discussed during the first negotiation and should be easily resolved. The letter concluded with a statement that the dollar amount Plaintiff was requesting "exceeds the Tribal Shares the Tribe has available for the Southern Ute Health Center." Id.

The first negotiation occurred on May 27, 2005. Pl's. Ex. 9. Present were the Acting Director and several representatives for Plaintiff. Plaintiff's counsel explained the details of the Tribe's proposal and pointed out that the proposal did indicate that Plaintiff would be taking over the programs, functions, services and activities ("PFSAs") under the CEO, the Health Center Director, the Clinical Director, the Chief Pharmacist, and the Administrative Officer. Id. At the conclusion of this negotiation, the Acting Director stated that, as far as he could tell, no declination issues existed. Id. Following this negotiation, Plaintiff consented to an additional extension until June 3, 2005. Pl's. Ex. 10. A second negotiation occurred on June 2, 2005. Pl's. Ex. 11. After this negotiation, the Acting Director prepared a summary of the agreement between Plaintiff and IHS which indicated that CSC funding had been discussed as a problem during the negotiation. Id. With regard to CSC, the summary states that,

---

[2] The precise meaning of this acronym is not made clear in the letter, but based on the previous statutory reference in the letter, it appears to be short-form for "program, function, service or activities."

> the new CSC language that generally states that there are no Start Up Costs or CSC available for contracting these PFSAs and the tribe will not be able to have the associated CSC dollar amount for this contract placed on the Que[3] was discussed with the tribe. They have requested this decision in writing and will notify the Area of their position following a review. The tribe understands that refusal to include this language will result in a proposal declination.

Pl's. Ex. 11.

On June 3, Plaintiff consented to another extension of time requested by IHS. Pl's. Ex. 10. In its letter of consent, Plaintiff indicated that it was providing the additional time so that IHS could complete the summary of agreement from the June 2, 2005 negotiation and to provide time to resolve issues regarding IHS's position on CSC. Id. The extension was given until June 17, 2005. Id. On June 17, 2005, Plaintiff consented to another extension until June 30, 2005 to resolve issues regarding IHS's new position on CSC. Id. Plaintiff stated it was unwilling at that time to agree to inclusion of new CSC language in its contract. Id.

On June 21, 2005, the Acting Director sent Plaintiff an email with IHS's new required CSC language for contracts involving new or expanded PSFA's. Pl's. Ex. 13. The email included forwarded messages that made clear that contracts must include language that IHS will not pay CSC, does not promise to pay CSC, that the tribes cannot rely on any promise to pay, and tribes cannot report a failure to receive CSC as a shortfall. Id. The IHS policy regarding the CSC language was apparently never formally published or adopted in any formal manner. The email indicates that the Acting Director "assumes" that the attached forwarded messages containing the new CSC language reflect the official position of IHS. Id. One of the forwarded attached messages from an IHS employee in Maryland indicates that Area Offices had received several

---

[3]There is no indication of the meaning of this term.

versions of the proposed CSC language, and it was not clear what language the Director had approved. Nonetheless, IHS insisted this language be included in Plaintiff's contract. The Acting Director indicated that he would prepare a declination of Plaintiff's proposal. Id.

On June 24, 2005, the Acting Director sent Plaintiff an email indicating that HQ[4] wanted the Area to decline Plaintiff's proposal based on a failure to agree on finances as well as other elements of the proposal. Pl's. Ex. 14. The Area Director indicated he preferred to decline solely on the issue of the CSC language. Id.

On June 29, 2005, Plaintiff granted another extension until July 15, 2005 and reiterated its unwillingness to agree to the new CSC language in its contract. Pl's. Ex. 10. On that same date, Plaintiff sent a letter to Defendant Toya, Director of the Area, stating that the Acting Director had previously hinted at a new IHS policy on CSC but that there was no disclosure to Plaintiff that the new policy might lead to declination of its proposal if it did not agree to contractually waive its statutory rights to CSC. Pl's. Ex. 15. Plaintiff stated that it would not likely have granted additional extensions if it had been aware that the new policy would be retroactively applied to its proposal. Id. Plaintiff stated its belief that the CSC policy could not be raised as a declination issue because the Area did not pursue a timely, good faith review of Plaintiff's proposal and "dragged its feet." Id. Plaintiff urged that it offended "principles of fundamental fairness to now make the Tribe's contract proposal retroactively subject to declination issues which did not exist when it first submitted its contract and only came into play after the Area Office's failure to review the Tribe's contract proposal in a timely manner." Id. Plaintiff further stated that it would

---

[4]Presumably referring the headquarters, but it is not clear where or whom "headquarters" is, i.e., whether this is a regional headquarters, the Office of the Secretary or some officer between these levels.

not agree to the CSC even if it were not being retroactively applied because "IHS has a statutory duty to provide CSC funds . . .." Id.  Plaintiff then stated its position that the declination criteria in the ISDEA do not give IHS discretion to refuse to enter into a contract if a tribe will not give up other rights under the ISDEA.  Id.  Plaintiff noted that the ISDEA includes a model agreement that provides for CSC, and that published IHS Circulars providing for CSC were not superseded by any subsequently published Circulars.  Id.  Plaintiff agreed to include the ISDEA model agreement language regarding CSC, but stated that it would challenge a declination based on its refusal to include the new CSC language developed by IHS.  Id.

On July 15, 2005, Defendant Toya sent Plaintiff a letter acknowledging receipt of Plaintiff's June 29 letter and indicating that his staff would research the issues raised by Plaintiff and develop a response.  Pl's. Ex. 16.  Defendant Toya never further responded to these issues.

On July 13, 2005, Plaintiff submitted an amendment to its contract proposal in which it proposed to take over all contractible PFSAs at the Clinic.  Pl's. Ex. 17.  On July 14, 2005, Plaintiff consented to an extension until August 15, 2005 to negotiate the amended proposal. Pl's. Ex. 10.  On July 18, 2005, Defendant Grim, Assistant Surgeon General and Director of IHS, sent a memorandum to all Area Directors stating that the decision of the United States Supreme Court in Cherokee Nation v. Leavitt interpreted ISDEA agreements as binding similar in nature to procurement contracts.  Pl's. Ex. 18.  He then noted that Congress had placed a cap on the amount of funds that IHS could use for CSC, and the appropriation does not include any funds for new or expanded program assumption by Indian Tribes.  Id.  Defendant Grim stated that, in light of the Supreme Court decision and the lack of appropriations, IHS would require language in any new or expanded contract indicating that there are no CSC funds available, the Tribe

wishes to contract the new or expanded PFSAs knowing that CSCs are not available, the Tribe is able to carry out the new or expanded PFSAs without added CSC funding, the Tribe agrees that no new need for CSC funding is created under the contract, and there is no promise by IHS to pay CSC.  Id.

On August 8, 2005, Plaintiff and Defendants' representatives met for a final negotiation session.  Pl's. Ex. 9.  At the end of this negotiation, the Acting Director indicated that the only outstanding issue was the disagreement over CSC language and all other potential declination issues had been resolved.  Id.  On August 11, 2005, Plaintiff's counsel sent the Acting Director a letter indicating his understanding that the only remaining issue was the CSC language and reiterating that the tribe would not agree to the language.  Pl's. Ex. 19.  The letter specifically stated that Plaintiff was able to implement the proposal without the CSC funding, but would not waive the statutory right to the funding.

On August 15, 2005, Defendant Toya sent a letter to Plaintiff declining the proposal.  Pl's. Ex. 21.  The letter outlines the five declination criteria from the ISDEA, 25 U.S.C. § 450f(a)(2)(A) through (E), and lists criteria (A), (C), (D), and (E) as the bases for declination.  Id.  In explaining the declination, Defendant Toya noted that Plaintiff was refusing to recognize in the contract that CSC is not available and that this has the effect of meeting criteria (C), (D) and (E).  Id.  Toya then concluded that criteria (A) was met because Plaintiff had not shown it would be able to operate and maintain the programs and provide satisfactory services without CSC funds.  Id.  The letter then lists an additional twelve reasons the proposal would have been declined even if Plaintiff had agreed to the CSC.  There is no evidence in the record that any of these twelve issues had been discussed with Plaintiff during negotiations.

On September 2, 2005, Plaintiff sent a letter to Defendant Toya in response to the declination indicating that the declination of the entire proposal on the stated grounds was unlawful. Plaintiff noted that none of the twelve additional criteria had ever been raised during negotiations, but that these grounds were irrelevant because Toya expressly stated they were not the actual grounds for declination. Plaintiff stated that these additional grounds were, however, an indication that IHS had negotiated in bad faith. Plaintiff urged that the declination of the entire proposal was unlawful, that the actual grounds stated for the declination were not factually accurate, and that the grounds were unlawful under the ISDEA.

Pursuant to 25 U.S.C. § 450f(b)(3) and 450m-1(a), Plaintiff filed a Complaint in this Court for damages and injunctive relief on September 15, 2005. Before the Court is the legal issue whether Defendants had discretion to decline Plaintiff's proposal on the basis that Plaintiff refused to include new CSC language developed by IHS in its contract.

## LEGAL STANDARD

Plaintiff's Motion for Preliminary Injunction fully briefs the legal issue whether Defendants had discretion to decline Plaintiff's ISDEA proposal on the basis of Plaintiff's refusal to include new CSC language. Defendants' Motion for Summary Judgment also fully briefs this issue. Based on the parties' agreement to consolidate the motion for preliminary injunction with the merits of this case and their representation that the issue is fully briefed and ready for determination, the Court will treat the parties' respective motions as cross motions for summary judgment.

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is "material"

if, under the governing law, it could have an effect on the outcome of the lawsuit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hardy v. S.F. Phosphates Ltd. Co., 185 F.3d 1076, 1079 (10th Cir. 1999).  When the parties to an action file cross motions for summary judgment, a court is entitled to assume that no evidence needs to be considered other than that filed by the parties.  Atlantic Richfield Co. v Farm Credit Bank of Wichita, 226 F.3d 1138 (10th Cir. 2000).  Summary judgment is not appropriate if disputes remain as to material facts.  Id.

Under the ISDEA, in any civil action brought pursuant to 25 U.S.C. § 450m-1(a) challenging the declination of a Tribe's contract proposal, the government bears the burden of establishing by clear and convincing evidence the validity of the grounds for declination.  25 U.S.C. § 450f(e)(1).

**DISCUSSION**

In their motion for summary judgment, Defendants make clear that for Fiscal Year 2005 (FY 2005) Congress capped the amount of appropriations that could be spent on contract support costs under the ISDEA and did not increase the appropriation of such funds to cover CSC for new or expanded self-determination contracts.  Defendants argue that entering into new self-determination contracts that require CSC would violate the Appropriations Clause of the United States Constitution, art. I, § 9, cl. 7.  They also argue that entering into such contracts would violate the Anti-Deficiency Act, 31 U.S.C. § 1341.  Defendants contend that the ISDEA does not require IHS to enter into contracts that exceed available funding because it permits the Secretary to decline a proposal if the amount of funds proposed under the contract exceed the applicable level of funding for the contract.

I.    ISDEA STATUTORY SCHEME FOR FUNDING AND DECLINATION

Under the ISDEA, the Secretary[5] "is directed, upon request of any Indian tribe by tribal resolution, to enter into a self-determination contract . . ." 25 U.S.C. § 450f(a)(1). An Indian tribe may submit a proposal for a self-determination contract to the Secretary,

> and the Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that –
>     (A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
>     (B) adequate protection of trust resources is not assured;
>     (C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
>     (D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or
>     (E) the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2).

As both parties note, Section 450f(a)(2)(D) allows the Secretary to decline a proposal if the amount of funds are in excess of the applicable funding level for the contract. However, the meaning of "applicable funding level" is not open to broad interpretation and is specifically defined by cross reference to Section 450j-1(a). Section 450j-1(a) provides that the amount of funds provided under a self-determination contract shall not be less than the Secretary would have provided for the operation of the program, and added to this required amount shall be contract

---

[5]Secretary is defined in the ISDEA as the Secretary of Health and Human Services or the Secretary of the Interior. 25 U.S.C. § 450b(i). In this case, the relevant Secretary is the Secretary of Health and Human Services.

support costs. 25 U.S.C. § 450j-1(a)(1) and (2).

The ISDEA provides model contract language in 25 U.S.C. § 450l. Every self-determination contract must contain or incorporate by reference the provisions of the model agreement. 25 U.S.C. § 450l(a)(1). The model agreement terms for funding state:

> Subject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement incorporated by reference in subsection (f)(2). Such amount shall not be less than the applicable amount determined pursuant to [25 U.S.C. § 450j-1].

25 U.S.C. § 450l(c)

> The government notes that Section 450j-1(b) states in part that:

> Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduced funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

25 U.S.C. § 450j-1(b).

II. DEFENDANTS DID NOT HAVE DISCRETION UNDER THE ISDEA TO DECLINE PLAINTIFF'S PROPOSAL FOR A SELF-DETERMINATION CONTRACT

The language of 25 U.S.C. § 450f(a)(2) clearly limits the discretion of the Government to decline an Indian Tribe's proposal for a self-determination contract to those specific criteria listed. In this case, the Government relies on Section 450f(a)(2)(D) arguing that the amount of funds proposed by Plaintiff was in excess of the applicable funding level because it included CSC when Congress had not appropriated sufficient funds for CSC for the fiscal year in which the contract was proposed. The Government notes that language in Section 450j-1(b) states that the provision of funds for self-determination contracts is subject to the availability of appropriations.

The basis on which the Government relies for declining Plaintiff's proposal specifically

13

cross-references Section 450j-1(a) to define "applicable funding level." The language of 450j-1(a)(2) provides that the applicable funding level includes CSC. Thus, the fact that Plaintiff's proposal included CSC was not a proposal for funds "in excess of the applicable funding level," and Section 450f(a)(2)(D) cannot provide the basis for the Government's declination of the contract. The language in Section 450j-1(b) that the provision of funds is subject to the availability of appropriations does not change this result. This subsection is not cross-referenced in the declination criteria and cannot form the basis for declining the Plaintiff's proposal.

### III. ENTRY BY THE GOVERNMENT INTO THE ISDEA CONTRACT WILL NOT VIOLATE THE APPROPRIATIONS CLAUSE OR ANTI-DEFICIENCY ACT

Notwithstanding the clear statutory mandate to enter into a self-determination contract unless one of the specific declination criteria applies to a Tribe's proposal, the Government argues that it is prohibited from entering into the contract by the Appropriations Clause of the United States Constitution, art. I, § 9, cl. 7. Similarly, it argues that it is prohibited from entering into the contract by the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A) and (B).

Under the Appropriations Clause, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. In cases cited by the Government decided on the basis of the Appropriations Clause, claimants were seeking payment from the government that had no underlying substantive authorizing statute. For instance, in Flick v. Liberty Mut. Fire Ins. Co., 205 F.3d 386 (9th Cir. 2000), a plaintiff's claim for coverage under a policy of flood insurance issued pursuant to and funded by the National Flood Insurance Act was denied. Federal regulations required that any claim for payment under such policy must be by a sworn proof of loss submitted within 60 days of loss, and the plaintiff

14

failed to submit a sworn proof of loss within that time period.  Id. at 389.  In determining that plaintiff was not entitled to payment, the court concluded that the Appropriations Clause precludes payment out of the Treasury in a **manner** not authorized by Congress.  Id. at 391 (emphasis added).

In Office of Personnel Management v. Richmond, 496 U.S. 414 (1990), a federal statute concerning eligibility for disability annuity payments to retired federal employees expressly provided that persons who earned more than a certain percentage of their pre-disability pay in any calendar year would lose their disability annuity payments for the following year.  An employee of the Office of Personnel Management ("OPM") had incorrectly informed an annuitant that he would keep his payments unless he earned above the percentage in two consecutive years.  The annuitant lost his payment for the year following the first year in which he earned above the percentage, and he sued OPM arguing that the Government was estopped from denying his payments.  The Supreme Court determined that the annuitant was seeking payment of money that was not authorized by any substantive law and any such payment would violate the Appropriations Clause.  Id. at 424.  The Court noted that an award in favor of the annuitant "would be in direct contravention of the federal statute upon which his ultimate claim to the funds must rest."  Id.  The Court referred to any such payment as an "extrastatutory payment."  Id. at 430.

The Anti-Deficiency Act prohibits government officers or employees to authorize expenditures or incur obligations in excess of Congressional appropriations.  31 U.S.C. §§ 1341.  In Richmond, the Supreme Court noted that allowing the annuitant to recover payment in contravention of the underlying authorizing statute would violate the Anti-Deficiency Act.  496 U.S. at 430.

In Richmond and Flick, the payment sought from the Treasury was not authorized by any substantive statute, and the payment would have violated the Appropriations Clause. In the instant case, Plaintiff seeks a contract that is not only authorized but mandated by statute. Because the contract is not an extrastatutory authorization or obligation, it does not violate the Appropriations Clause.

Because the statutory scheme in the ISDEA does not give the Secretary discretion to decline a proposal on the basis of underfunding in Congressional appropriations, the executive branch officers and employees will not be in violation of the Anti-Deficiency Act by carrying out their statutory obligations to approve Plaintiff's proposal. It is not the executive branch that has obligated the government; rather, it is Congress through the ISDEA that has obligated the Government. Moreover, the Government's concerns with regard to the Anti-Deficiency Act are satisfied by the model contract language within the ISDEA that funding is subject to the availability of appropriations which language Plaintiff agreed should be included in its contract.

The Government's argument that its statutory duty to approve Plaintiff's proposal has been alleviated by the lack of sufficient Congressional appropriations is, in essence, an assertion that the appropriations law amends or repeals the substantive provisions of the ISDEA. "The mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." Greenlee County, Ariz. v. United States, -- F.3d --, 2007 WL 1391389 *4 (Fed. Cir. 2007); see also Whatley v. District of Columbia, 447 F.3d 814, 819 (D.C. Cir. 2006) (noting the presumption that appropriations acts do not amend substantive law). When appropriations acts conflict with underlying substantive law, their effect must be

16

narrowly construed. Calloway v. District of Columbia, 216 F.3d 1, 9 (D.C. Cir. 2000). "When two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." Highland Falls - Fort Montgomery Central Sch. Dist., 48 F.3d 1166, 1171 (Fed. Cir. 1995) (citing Morton v. Mancari, 417 U.S. 535, 551 (1974)). In this case, the Secretary's obligations to approve proposals under the ISDEA have not been amended or repealed by any heretofore enacted annual appropriations act, and the Secretary's obligation to accept proposals from Indian Tribes remains what it has always been. Additionally, the appropriations acts have not amended the ISDEA by expanding the declination criteria or the Secretary's discretion to decline proposals.

The Government's interpretation of its discretion under the ISDEA in light of annual appropriations is actually contrary to the very purpose of the Appropriations Clause. Under the Appropriations Clause, only the legislative branch and not the executive branch of government may make ultimate decisions regarding public funds. The IHS may not unilaterally amend the ISDEA by altering the declination criteria in the ISDEA, eliminating an element of the funding scheme for Self-Determination contracts, or developing new contract language that contradicts the statutory model language developed by Congress.

The Government's reaction to the Supreme Court decision in Cherokee Nation of Okla v. Leavitt, 543 U.S. 631 (2005) is not unreasonable. In Cherokee, the Court made clear that the Government is obligated to pay its contract obligations under the ISDEA even when there are insufficient specific appropriations so long as there are sufficient unrestricted appropriations. Id. at 643. It seems the Government is between a rock and a hard place if it has no discretion to decline contracts, no discretion to pay less than full CSC on all outstanding contracts, and

17

receives inadequate appropriations to meet its obligations. However, the Supreme Court did not decide what the Government's obligations to pay CSC would be if Congress explicitly prohibited the use of unrestricted funds to meet these obligations. Furthermore, the Supreme Court hinted that the Government's obligation to pay CSC might be different if Congress did not appropriate adequate unrestricted funds. Accordingly, the Government cannot speculate that the Supreme Court will require it to pay obligations for which there are no unrestricted funds available and engage in self-help statutory amendment to avoid the anticipated result of such a decision.

On a final note, the Government argues that the Supreme Court "warned" it that it must refrain from making commitments it cannot fulfill. In Cherokee, the Supreme Court stated:

> We recognize that agencies may sometimes find that they must spend unrestricted appropriated funds to satisfy needs they believe more important than fulfilling a contractual obligation. But the law normally expects the Government to avoid such situations, for example, by refraining from making less essential contractual commitments; or by asking Congress in advance to protect funds needed for more essential purposes with statutory earmarks; or by seeking added funding from Congress; or, if necessary, by using unrestricted funds for the more essential purpose while leaving the contractor free to pursue appropriate legal remedies arising because the Government broke its contractual promise.

543 U.S. at 642. This language is not a warning to the Government not to enter into contracts. Refraining from less essential contractual commitments is merely one of several examples of ways an agency might reserve its unrestricted funds for uses other than paying on contracts. The Court did not address the Government's obligations to enter into contracts under the ISDEA and was not suggesting that the Government attempt to redefine its statutory obligations. Interestingly, one of the Court's suggestions is that the Government seek protection of funds by requesting statutory earmarks. This appears to be another suggestion that the Government's obligation to pay CSC may be different when there are no unrestricted funds available to pay them. I note that

18

the funding for FY 2005 specified that the money earmarked for CSC was the only money to be used to pay for CSC.  See P.L. 108-447, 118 Stat. 2089, 3084.[6]

**CONCLUSION**

Based on the above analysis, I conclude that Defendants did not have discretion to decline Plaintiff's proposal on the basis of insufficient Congressional appropriations to pay CSC and did not have discretion to condition approval of Plaintiff's proposal on new contract language contradicting statutory model language or on Plaintiff's waiver of funding specifically provided under the ISDEA.  Accordingly, Plaintiff is entitled to summary judgment on this issue and its first and second causes of action in its Complaint and is entitled to injunctive relief in accordance with 25 U.S.C. § 440m-1(a).  Plaintiff is directed to prepare a form of order for injunctive relief, submit it to Defendants for approval as to form, and then submit it to the Court through the email address indicated on my web page for proposed orders.  The proposed order must be submitted in WordPerfect or Rich Text format.  If parties are unable to reach agreement as to the form of an order, Plaintiff shall file a motion for a presentment hearing.

---

[6] While decided ten years before the decision in Cherokee, the decision in Highland Falls-Fort Montgomery Central Sch. Dist. v. United States, 48 F.3d 1166 (Fed. Cir. 1995), suggests that caps on funds available to pay entitlements results in the Government's obligation to alter its allocation of funds in order to abide by both the substantive law as well as the Anti-Deficiency Act.  In that case, the court addressed entitlement payments under the Impact Aid Act ("IAA").  The IAA provided assistance to school districts financially burdened by federal ownership of real property within the school district.  Id. at 1168.  Congress had not appropriated sufficient funds in fiscal years 1989 through 1993 to fully fund entitlements under the IAA; it had earmarked insufficient funds for that entitlement, and all other appropriations were earmarked for other entitlements.  Id. at 1169.  The Secretary of Education had allocated funds for the entitlements based on the earmarked appropriations, and the plaintiff school district received less than its full entitlement for those years.  Id.  The plaintiff school district sought its full entitlement arguing that the Department of Education ("DOE") had erred in concluding that the earmarked appropriations had priority over the formula for entitlements in the underlying authorizing statute.  Id. at 1170.  The Federal Circuit concluded based in part on the Anti-Deficiency Act that the DOE had not erred in paying its entitlement obligations by allocating from the earmarked funds rather than paying the full amount of entitlements.

The remaining issues are those raised in Plaintiff's third cause of action with regard to the Administrative Procedures Act, and any issue of damages. The Court shall hold a pre-trial conference in the near future to hear from counsel on what type of hearing or trial will be required to resolve the remaining issues.

**IT IS SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE